CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED
08/25/2025
LAURA A. AUSTIN, CLERK
BY: /s/ Amy Fansler
       DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| SAMANTHA O., ) | |
|     Plaintiff, ) | |
| ) | Civil Action No. 5:24cv00077 |
| v. ) | |
| ) | REPORT & RECOMMENDATION |
| FRANK BISIGNANO, ) | |
| Commissioner of Social Security, ) | By:   Joel C. Hoppe |
|     Defendant. ) | United States Magistrate Judge |

Plaintiff Samantha O. asks this Court to review the Commissioner of Social Security's final decision denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record ("R."), ECF No. 7; the parties' briefs, ECF Nos. 11, 15, 16; and the applicable law, I find that substantial evidence does not support the denial of benefits. Accordingly, I respectfully recommend that the presiding District Judge reverse the Commissioner's final decision and remand it for further administrative proceedings. 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 1383(c)(3); *see Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it cannot "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings and final decision. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011);

1

*see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); *accord* 20 C.F.R. § 416.905(a).[1] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the written decision subject to judicial review under 42 U.S.C. § 405.

2

perform other, less demanding work existing in the economy. *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Background

This is Samantha's fourth SSI application. *See* R. 148. Her third application, filed in October 2017, resulted in a final decision that she was not disabled through July 20, 2020, because her residual functional capacity ("RFC") allowed her to perform certain light, unskilled occupations existing in the national economy. *See* R. 106, 112–13, 148.

Samantha filed this SSI application on March 29, 2021. R. 261. She alleged disability based on several medical conditions, including migraine headaches, epilepsy, bipolar disorder, anxiety, depression, and ADD/ADHD. R. 148; *see* R. 104. Samantha was 32 years old, or a "younger person" under the regulations, in March 2021. R. 148; *see* 20 C.F.R. § 416.963(c). Virginia Disability Determination Services ("DDS") denied the claim initially in June 2022, R. 147; *see* R. 152–157, and upon reconsideration in January 2023, R. 159; *see* R. 162–69. That July, Samantha appeared with a non-attorney representative and testified at an ALJ hearing. *See* R. 18, 52–67. A vocational expert ("VE") also testified. R. 67–71.

The ALJ issued an unfavorable decision in November 2023. R. 18–35. The ALJ noted that the relevant period for Samantha's SSI claim was March 29, 2021, the application date, through November 6, 2023, the date the decision was issued. *See* R. 18. At step two, the ALJ found that Samantha had numerous "severe" medical impairments, including morbid obesity, migraine headaches, epilepsy, bipolar disorder, personality disorder, anxiety, schizophrenia, ADHD, and substance addiction disorder. *See* R. 20–21. These impairments did not meet or

3

equal the severity of a relevant Listing. *See* R. 21–25 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 4.02, 11.02, 12.04, 12.06, 12.08, 12.11). As part of this determination, the ALJ concluded that Samantha's severe mental impairments caused "mild" limitations understanding remembering, or applying information, interacting with others, and adapting or managing herself, and "moderate" limitations in concentrating, persisting, or maintaining pace. R. 22–24 (citing R. 334–39, 407, 421, 625, 640, 663, 671, 1262, 1271, 1306, 1950, 1968, 1970, 2090, 2107, 2109, 2118, 2124, 2134, 2136, 2155, 2212–13); *see also* R. 31 (citing R. 152, 164).

The ALJ then evaluated Samantha's RFC. *See* R. 25–34. The ALJ found that Samantha could perform "light" work as defined in the regulations, 20 C.F.R. § 416.967(b), except:

> occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; avoid all exposure to unprotected heights, moving machinery, open flames, and open bodies of water; can understand, remember, and carry out simple instructions; can perform simple repetitive tasks; occasional interaction with coworkers and supervisors; no direct contact with the public; no production rate pace work, meaning no assembly line or quota work, but can perform goal-oriented work; and occasional changes in the workplace.

R. 25. The restrictions on the complexity of work, social interaction, persistence/pace, and workplace changes, *see id.*, match the previous ALJ's mental RFC finding establishing the same restrictions, *see* R. 33 (citing R. 106). They are consistent with aspects of medical opinions from DDS psychologists who reviewed Samantha's record in June 2022, R. 156–57 (Richard Luck, Ph.D.), and January 2023, R. 167–69 (Howard Leizer, Ph.D.), respectively. *See* R. 31–32 (citing R. 152–53, 164). The ALJ also rejected a medical opinion from Samantha's neurologist, Neil Crowe, M.D., stating that she is "incapable of even low stress work" and would be "absent from work more than 3 times per month." *See* R. 31–32 (citing R. 2227). Because the ALJ found this "provider's name illegible," however, the ALJ did not acknowledge that the medical opinion was from Dr. Crowe. R. 31.

4

At step four, the ALJ found that Samantha has no past relevant work. R. 34. Relying on the VE's testimony at step five, however, the ALJ found that Samantha's RFC, age, and education allowed her to do certain light, unskilled occupations (small-parts assembler, laundry worker, shipping-receiving weigher) existing in the national economy. R. 34 (citing R. 67–69). Accordingly, the ALJ concluded that Samantha was not disabled from March 29, 2021, through the date of her decision. *Id.* The Appeals Council denied Samantha's request to review that decision, R. 1–6, and this appeal followed, ECF No. 1.

### III. Discussion

Samantha makes two arguments on appeal, both of which challenge the ALJ's evaluation of the medical opinions, 20 C.F.R. § 416.920c, when determining Samantha's RFC. *See* Pl.'s Br. 7–10 (Dr. Leizer's opinion); Pl.'s Reply 1–2 (same); Pl.'s Br. 11–15 (Dr. Crowe's opinion). First, she objects that the ALJ's RFC finding, R. 25, omits without explanation the part of Dr. Leizer's opinion stating that Samantha could sustain work "with only minimal need for accommodation on an infrequent basis," R. 168, even though the ALJ found Dr. Leizer's opinion "partially persuasive" overall, R. 31. *See* Pl.'s Br. 7–10; Pl.'s Reply 1–2. Samantha asks the Court to reverse the Commissioner's denial of benefits and remand her case because she believes that it is impossible to discern how the ALJ "considered and resolved" this purported "conflict[] between the opinion evidence" and the RFC finding. Pl.'s Reply 1–2; *see also* Pl.'s Br. 7–10. She does not suggest that the ALJ's failure to include the specific language quoted above in the RFC finding "might have changed the outcome of [her] disability claim," *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). *See generally* Pl.'s Br. 7–10; Pl.'s Reply 1–2.

Second, Samantha asserts that the ALJ incorrectly found the "provider's name illegible" on Dr. Crowe's medical-source statements, *see* R. 31 (citing R. 2227). Samantha points out that

5

"Physician Name: Neil Crowe" and "Specialty: Neurology" are printed at the bottom of the forms, R. 2224, 2227, and the ALJ had already summarized some of Dr. Crowe's treatment notes, R. 28 (citing R. 555–56, 1091, 1994, 2007, 2021, 2033, 2133–34). *See* Pl.'s Br. 11, 13–14 (citing R. 556, 828, 949, 1989–2000, 2033–50, 2134, 2136, 2227, 2229–33). Samantha argues that the ALJ's factual error made it "impossible" for her "to consider the extent of support Dr. Crowe provided supporting/explaining the reasoning behind his opinions." Pl.'s Br. 14 (citing 20 C.F.R. § 416.920c(c)(1)).

A.  *Medical Evidence*

On September 21, 2021, Samantha reported a history of "migraine headaches. She states that she has previously taken Imitrex for relief of migraine headaches, however she has no refills available." R. 659. The record notes that she was positive for headaches and dizziness. R. 662. On exam, however, she was not in acute distress and not ill-appearing. *Id.* She had no focal, cranial nerve, or sensory deficit and a normal gait. R. 663. Her mood, behavior, thought content, and judgment were normal. R. 663. The next day, on September 22, 2021, Samantha went to the emergency department ("ER") "with code stroke, chest pain, and migraine." R. 590, 591, 595. She reported that she had a seizure earlier in the day and then "began to have a migraine, [left-]sided numbness and tingling, [right-]sided weakness, and slurred speech." R. 591. However, her "[w]ork-up came back negative for acute issues." R. 1268. There were "no acute findings of stroke." R. 642. During her stay in the ER, her providers noted some anxiety, R. 604, 624, but also that she was "in no acute distress," R. 592, 604, 608, 628, 640, 645, 650, 655, 662; that she could "[f]ollow 1 step commands without difficulty," R. 1300; that she was alert and oriented, R. 604, 608, 628, 640, 645, 650, 655, 662; and that her memory appeared intact, R. 612. At her follow-up in October 2021, Samantha "state[d] that she [was] feeling better," but was continuing

6

to have intermittent headache pain with no visual disturbances. R. 585. She was alert and oriented and her mood, behavior, and thought content were normal. R. 588. In December 2021, she reported having two seizures "since she ran out of her Keppra" in November, but that normally "her seizures are well controlled without side effects." R. 581. She was alert and oriented. R. 583. Her judgment and insight were intact. *Id.*

In January 2022, Samantha complained about a migraine that was "non-responsive to typical [m]igraine medications." R. 571. She had no visual disturbances. *Id.* During her exam, the provider noted that she "respond[ed] appropriately;" that she was "alert, oriented x3;" that she had no focal deficits; that her gait was normal; and that her mood and thought content were normal. R. 574.

In February 2022, Samantha visited Winchester Cardiology and Vascular Medicine for a follow-up, but denied "having any complaints." R. 533. Samantha was "[p]ositive for headaches," but negative for dizziness and loss of consciousness. R. 534. Later in February, Samantha visited Winchester Neurological Consultants with complaints of a migraine, nausea, slurred speech, and left-sided numbness. R. 555. Samantha reported that her head was "throbbing" and she was nauseous, but "denie[d] focal neuro[logical] deficits." *Id.* Samantha noted that her symptoms improved with resting in a dark room with a cold compress. *Id.* On exam, she was "[a]lert, no acute distress;" she "identifie[d] objects and [was] able to relay medical history without difficulty;" her speech was fluent; and she ambulated without assistance. R. 556. She was referred to Neil Crowe, M.D., for migraine management. *Id.*

In April 2022, Samantha visited Dr. Crowe at Winchester Neurology Consultants. R. 2007. She presented with excessive daytime sleepiness, insomnia, sleeping difficulty, headaches, epilepsy, pain, heart disease, hypertension, anxiety, and depression. R. 2007, 2049. She was

7

diagnosed with obstructive sleep apnea. R. 2007, 2049. On May 2, 2022, Samantha visited Dr. Crowe for a migraine. R. 2033. Samantha reported that they occur every other day and include nausea, occasional vomiting, or bad heartburn. *Id.* Dr. Crowe noted that she was alert and cooperative. *Id.*

On May 13, 2022, Samantha reported to her primary care physician that "she has been taking Keppra regularly without side effects and has not had any seizure." R. 2087. For her bipolar disorder and schizophrenia, she reported that she "has been doing well." *Id.* For her migraine, she reported that her medicine "has been working well." *Id.* She was "alert and oriented x 3 with cordial affect;" and her cranial nerves were normal. R. 2090. She was diagnosed with "[m]anic bipolar I disorder in full remission with mood-congruent psychotic features;" a history of schizophrenia; and a "history of cerebrovascular accident with residual deficits." *Id.*

In May 2023, Samantha visited Dr. Crowe for a follow-up regarding her migraines, obstructive sleep apnea, epilepsy, and history of stroke. R. 2133. She reported no significant improvement in her migraines and that she currently has 21 migraine days per month. *Id.* Samantha reported having a seizure 3 weeks ago, and that she averages 3 breakthrough seizures per month. *Id.* Dr. Crowe started Samantha on botox for her migraines because she reported that the other medicine was not working. *Id.* On exam, Samantha was "pleasant and cooperative. Alert and oriented x 3. Speech is clear. There is 5/5 motor strength throughout. Ambulates with a normal based gait." R. 2134. Dr. Crowe noted that she has a history of medication noncompliance, although Samantha denied this. *Id.*

B.   *Medical Opinions*

On reconsideration, DDS psychologist Dr. Leizer assessed Samantha's mental

8

impairments by applying the regulation's "special technique," 20 C.F.R. § 416.920a, and concluded that she had "mild" limitations in understanding, remembering, or applying information, interacting with others, and adapting or managing oneself, and a "moderate" limitation in concentrating, persisting, or maintaining pace. R. 164. Dr. Leizer then used these broad "paragraph B" ratings to assess Samantha's mental RFC. *See* R. 167–68. He concluded that her "mild" limitations did not translate into any specific work-related "understanding and memory limitations," "social interaction limitations," or "adaptation limitations" that should be included in an RFC finding. *See id.* However, he concluded that Samantha's overall "moderate" limitation in concentrating, persisting, or maintaining pace did translate into two (out of eight) work-related "sustained concentration and persistence limitations." *See id.* Her abilities to "maintain attention for extended periods" and to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest" breaks were both "moderately limited." R. 168. To support these limitations, Dr. Leizer explained that Samantha:

> can get overwhelmed at times. [She] would be able to maintain concentration and attention for two hours periods in order to complete an eight hour work day and would overall be able to complete a normal work week and to perform at a pace generally consistent with others, with only minimal need for accommodations on an infrequent basis.

*Id.* He also concluded that Samantha's migraines were a "non-severe" impairment. R. 164–65.

Dr. Crowe completed two medical source statements in June 2023. He noted he saw Samantha "approximately every 3 months" since September 2021, for chronic "severe intermittent" migraines, seizure disorder, and history of trans-ischemic attack. R. 2222. In the first report, Dr. Crowe stated that he did not know to what degree Samantha could tolerate work stress, but opined that Samantha would miss more than three days per month because of her impairments, primarily migraines. R. 2224. Dr. Crowe filled out the second report on the same

9

day. Again, he concluded that she would need to miss more than three days of work per month, primarily because of seizures. R. 2227. Dr. Crowe stated that Samantha is "[i]ncapable of even low-stress jobs." R. 2226. As support for the opinions, Dr. Crowe noted that Samantha had seen neurology every three months; her clinical findings were mostly normal or negative; she had diagnoses of migraines, obstructive sleep apnea, transient ischemic attack, bipolar disorder, and possible epilepsy; she had symptoms of left-side numbness, severe intermittent migraines, excessive daytime sleepiness, and insomnia; and she took Depakote and Keppra, but continued to report having seizures. R. 2222, 2226. Samantha reported having twenty-one migraines a month, R. 2223, and three seizures a month, R. 2225. The migraines were so "severe" that they "prevent[ed] all activity." R. 2223. Her associated symptoms were nausea, vomiting, inability to concentrate, photophobia, throbbing pain, pain worse with activity, avoidance of activity, impaired sleep, and numbness. R. 2222, 2223, 2226. Nothing made her headaches better. R. 2223.

C.  *The ALJ's Opinion*

The ALJ found Dr. Leizer's mental RFC assessment "partially persuasive." R. 31. The ALJ explained that Dr. Leizer's medical opinion is "partially consistent with the record" and supported by the medical evidence of record. R. 31. The ALJ noted that in January 2021, Samantha was anxious because of stress caused by her neighbors, but her thought process was organized, her memory was normal, and she was attentive and alert. R. 31 (citing R. 419, 421). In April 2021, Samanta reported that she was doing much better and had no significant depression, sleep problems, mood swings, or irritability. R. 31 (citing R. 407). The ALJ also noted records from September 2021 that showed Samantha's thought process was organized and goal directed and that she could follow one-step commands and relay medical history without

any difficulty. R. 31 (citing R. 1300, 1328). In May and October 2022, Samantha's mood was good, her affect was brighter, her memory was intact, her thought process was organized, her speech was clear, she was attentive, and she was oriented to person, place, and time. *Id.* The ALJ ended her analysis of Dr. Leizer's opinion by noting that in June 2023, Samantha's mood was euthymic, her speech was normal, her memory was intact, she was oriented to time, place, and person, and her thought process was unremarkable. R. 31 (citing R. 2212).

As to Dr. Crowe's medical opinions the ALJ found the "provider's name [is] illegible." R. 32. The ALJ explained that the opinions were unpersuasive because "there is no medical evidence to support the conclusion that [Samantha] is incapable of even low stress work, or that she would be absent more than 3 days per month." R. 31. The ALJ also noted that Samantha's seizures were normally well controlled without side effects when she took her medications. R. 32 (citing R. 581, 2090–91). Examinations showed that she had no focal or neurological deficits when she did report having seizures. *Id.* The ALJ noted that Samantha reported three breakthrough seizures a month, with the most recent occurring three weeks prior. R. 32 (citing R. 2133). The ALJ addressed Dr. Crowe's conclusion that Samantha is incapable of even low stress work, finding it unsupported by the medical evidence "which consistently shows that [Samantha] has no significant depression, irritability or, mood swings." R. 32 (citing R. 407). The ALJ also noted that Samantha was able to use coping skills, her functional status was intact, and in June 2023, she reported doing "'really well, and that she has been active in accomplishing all of her recent tasks on a daily basis." R. 32 (citing R. 2209).

D.   *Analysis*

A claimant's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his or her

11

medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), including objective medical findings, medical opinions, and the claimant's own statements describing his or her medical condition, 20 C.F.R. § 416.945(a), (e). The ALJ's RFC finding should reflect all credibly established "restrictions caused by medical impairments and their related symptoms" that impact the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis, SSR 96-8p, 1996 WL 374184, at *1–2. *See Macio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015). The ALJ has broad discretion to determine if an alleged restriction is supported by and consistent with relevant evidence in the claimant's record. *See Hines*, 453 F.3d at 564–66; *Perry v. Colvin*, 2:15cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). Generally, a reviewing court will affirm the ALJ's RFC findings when he or she considered all relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and the written decision built an "accurate and logical bridge from that evidence to his [or her] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). *See Thomas v. Berryhill*, 916 F.3d 307, 311–12 (4th Cir. 2019).

Medical opinions play an important role in a proper RFC assessment. 20 C.F.R. § 416.945(a)(3); *see, e.g.*, *Oakes v. Kijakazi*, 70 F.4th 207, 212–15 (4th Cir. 2023). "Medical opinions" are "statement[s] from a medical source about what [the claimant] can still do despite" her MDIs and whether she has any "impairment related limitations or restrictions" in meeting specific functional demands of work. 20 C.F.R. § 416.913(a)(2). For SSI claims filed on or after March 27, 2017, ALJs "will articulate" in their decisions "how persuasive [they] find all of the

medical opinions . . . in [the] case record" to be. *Id.* § 416.920c(b). When evaluating persuasiveness, ALJs "will consider [all] medical opinions . . . using the [following] factors:" (1) supportability; (2) consistency; (3) a physician's relationship with the claimant; (4) a physician's specialization; and (5) other factors, like the physician's familiarity with the evidentiary record. *See Oakes*, 70 F.4th at 212 (citation omitted). The first two factors—supportability and consistency—"are the most important factors [ALJs] consider when [they] determine how persuasive [they] find a medical source's medical opinions . . . to be." 20 C.F.R. § 416.920c(b)(2). Therefore, ALJs "will explain how [they] considered the supportability and consistency factors for [each] medical source's medical opinions." *Id.* They "may, but are not required to, explain how [they] considered the [other] factors" in determining how persuasive the source's medical opinions are to the disability determination. *Id.*; *see Drumgold v. Comm'r of Soc. Sec.*, 144 F.4th 596, 604–06 (4th Cir. 2025) (discussing 20 C.F.R. § 404.1520c(b)).

"Supportability is the degree to which a [source] supports their opinion with relevant, objective medical evidence and explanation." *Oakes*, 70 F.4th at 212 (citation omitted). "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be" in the ALJ's disability determination. 20 C.F.R. § 416.920c(c)(1). "This makes sense: In disability claims, as in life, opinions are more persuasive when evidence backs them up." *Drumgold*, 144 F.4th at 606. "[C]onsistency is the degree to which a provider's opinion is consistent with the evidence of other medical and non-medical sources in the record." *Oakes*, 70 F.4th at 212 (citation omitted). "The more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim [record], the more persuasive the medical opinion(s) . . . will be" in the ALJ's disability determination. 20 C.F.R. §

13

416.920c(c)(2). "Like supportability, consistency also makes sense: If a host of sources say one thing, but a single source says something different, then one should question the relatability of the contradictory source." *Drumgold*, 144 F.4th at 607. ALJs are responsible for determining how persuasive medical opinions are based on all the relevant evidence in the claimant's record. *See id.* at 605–06. When the ALJ does this in a manner consistent with the regulation, a court will not second-guess that "decision unless it is exceptionally clear that the ALJ made a mistake." *Id.* at 605.

Samantha challenges the ALJ's evaluation of Dr. Leizer's and Dr. Crowe's medical opinions. First, she asserts that the ALJ's RFC finding should have expressly included Dr. Leizer's finding that she had "only minimal need for accommodation on an infrequent basis," R. 168. As the party seeking benefits, she bears the burden to show that her medical impairments or related symptoms restricted a specific work-related function "in excess of the ALJ's RFC finding." *See Keener v. Kijakazi*, No. 1:21-cv-79, 2022 WL 264878, at *6 (W.D.N.C. Jan. 27, 2022) (collecting cases). She has not met this burden. Samantha does not suggest that the above quoted language addresses a *specific* functional demand of full-time, unskilled work. *See, e.g.*, SSR 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985) ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting."). Nor does she propose a specific limitation the ALJ should have included in the RFC finding to account for Dr. Leizer's explanation that she could sustain unskilled work with "only minimal need for accommodations on an infrequent basis."[2] *Virginia B. v. Kijakazi*, No. 1:20-cv-493, 2021 WL 4515410, at *12

---

[2] As noted, Dr. Leizer's opinion reads in its entirety:

(E.D. Va. Aug. 17, 2021), *adopted sub nom. Michael D. v. Kijakazi*, 2021 WL 4513596 (E.D. Va. Oct. 1, 2021), *aff'd sub nom. Belveal v. Comm'r of Soc. Sec.*, No. 21-2343, 2023 WL 4787452 (4th Cir. July 27, 2023). She does not argue that the ALJ's failure to include Dr. Leizer's specific language in the RFC finding "might have changed the outcome of [her] disability claim," *Reid*, 769 F.3d at 865.

Samantha correctly notes that the ALJ found Dr. Leizer's opinion partially persuasive. Pl.'s Br. 8. She implies that this Court cannot discern how the ALJ assessed her RFC because the ALJ found Dr. Leizer's opinion was supported by the record, but then omitted without explanation the phrase "only minimal need for accommodations on an infrequent basis" from the RFC finding. I disagree. A fair reading of the ALJ's decision as a whole shows that the ALJ found the opinion partially persuasive because Samantha's record established *additional* mental RFC limitations. *See* R. 33 (citing R. 106). The ALJ's RFC finding limited Samantha to "no production rate pace work, meaning no assembly line or quota work," R. 25, which is a reasonable accommodation for moderate sustained concentration and persistence limitations, R. 167–68. *Cf. Jessie F. v. Bisignano*, No. 1:24-cv-995, 2025 WL 1950265, at *3 (M.D.N.C. May 28, 2025) ("[T]he ALJ's non-production restriction, in and of itself, adequately accounted for Plaintiff's moderate limitation in concentration, persistence, and pace.") (citation omitted). The ALJ also added limitations on social interaction and work-place stress, *see* R. 25, which Dr. Leizer did not find necessary, *see* R. 168. For example, the ALJ found that Samantha should

---

> Claimant would be able to maintain concentration and attention for two hour periods in order to complete an eight hour day and would overall be able to complete a normal work week and to perform at a pace generally consistent with others, with only minimal need for accommodations on an infrequent basis.

R. 168. The language Samantha seizes upon comes from Dr. Leizer's explanation of the limitations he assessed.

15

have only "occasional interaction with coworkers and supervisors," but "no direct contact with the public," and could deal with at most "occasional changes in the workplace." R. 25. Dr. Leizer did not put any restrictions on those work activities. Samantha "has not indicated how the ALJ could have further accounted for [her] need for unknown, minimal, infrequent accommodation." *Virginia B.*, 2021 WL 4515410, at *12.

Samantha also challenges the evaluation of Dr. Crowe's opinion. Pl.'s Br. 10–15. She takes issue with the fact that the ALJ noted, "provider's name illegible" in describing who wrote the opinion. *Id.* at 11. I agree that this opinion is from Dr. Crowe, R. 2224, 2227 (noting physician's name), and the ALJ was clearly mistaken to say his name was illegible.

Dr. Crowe identified two conditions that primarily affected Samantha's functional abilities: seizures and migraine headaches. As to Samantha's seizure disorder, the ALJ's analysis of Dr. Crowe's opinions focuses on consistency. The ALJ cited evidence that she found inconsistent with the proposed attendance limitation, including examples where Samantha and her physicians noted her seizure disorder was "controlled" on medication. R. 32 (citing R. 581, 2090–91); *cf. Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling."). The ALJ also noted that Samantha had not complied with treatment by failing to take her medication. *Id.* (citing R. 2134). The ALJ's discussion adequately addresses Dr. Crowe's opinion of limitations caused by Samantha's seizure disorder.

Nevertheless, the ALJ completely failed to address Dr. Crowe's opinion that Samantha would miss more than three days of work a month because of migraines. *See* R. 32–33. That limitation would preclude her from being able to work a full-time job. To support his opinion, Dr. Crowe referenced symptoms, clinical findings, diagnoses, and treatment that were largely

16

consistent with his treatment notes. R. 2222. "Supportability" evaluates the extent to which *the provider supports* his or her *own* opinions with medical evidence and explanations. 20 C.F.R. § 416.920c(c)(1). "The more relevant the objective medical evidence and supporting explanations *presented by a medical source* are to support his or her medical opinion(s) . . . , the more persuasive" those opinions will be in the ALJ's determination. *Id.* (emphasis added). The ALJ did not address the supportability or consistency of Dr. Crowe's opinion regarding the limitations caused by Samantha's migraines. Accordingly, the ALJ's assessment of Dr. Crowe's opinion is not supported by substantial evidence.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **REVERSE** the Commissioner's final decision, **REMAND** the case for additional administrative proceedings, and **DISMISS** the case from the Court's active docket.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of record.

ENTER: August 25, 2025

*[signature: Joel C. Hoppe]*

Joel C. Hoppe
United States Magistrate Judge